IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TINA MARIE SEARS,

        Plaintiff,

v.                                       CIV 17-0391 JB/KBM

NANCY A. BERRYHILL,
Acting Commissioner of Social
Security Administration,

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Plaintiff's Motion to Reverse or Remand
Administrative Agency Decision and Memorandum Brief (*Doc. 16*) filed on August 22,
2017. Having carefully reviewed the parties' positions and the material portions of the
record, the Court recommends that Plaintiff's motion be denied and the decision of the
Agency affirmed.[1]

## I.    Procedural History

Ms. Tina Marie Sears (Plaintiff) filed an application with the Social Security
Administration for Disability Insurance Benefits (DIB) under Title II of the Social Security
Act on March 26, 2015. Administrative Record[2] (AR) at 98. Plaintiff alleged a disability

---

[1] District Judge Browning entered an Order of Reference Relating to Social Security Appeals on
August 9, 2017, referring this case to the undersigned Magistrate Judge "to conduct hearings, if
warranted, including evidentiary hearings, and to perform any legal analysis required to
recommend to the Court an ultimate disposition of the case." *Doc. 14*.

[2] Document 9-1 comprises the sealed Administrative Record. *See Doc. 9-1*. The Court cites the
Administrative Record's internal pagination, rather than the CM/ECF document number and
page.

onset date of December 17, 2013.[3] *See* AR at 95-96, 99. Because Plaintiff's earning record showed that she had "acquired sufficient quarters of coverage to remain insured through March 31, 2015[,]" Plaintiff was required to "establish disability on or before that date in order to be entitled to a period of disability and [DIB]." AR at 15.

Disability Determination Services determined that Plaintiff was not disabled both initially (AR at 98-109) and on reconsideration (AR at 110-21). Plaintiff requested a hearing with an Administrative Law Judge (ALJ) on the merits of her application. AR at 131. Both Plaintiff and a vocational expert (VE) testified during the *de novo* hearing. *See* AR at 32-97. ALJ Lillian Richter issued an unfavorable decision on November 4, 2016. AR at 12-31. Plaintiff submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR at 6), which the Council denied on February 28, 2017 (AR at 1-5). Consequently, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## II.    Applicable Law and the ALJ's Findings

A claimant seeking disability benefits must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 404.1520(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

---

[3] Plaintiff originally alleged an onset date of September 1, 2012, in her application, but amended the alleged onset date to December 17, 2013, at the hearing. AR at 95-96, 99.

The claimant has the burden at the first four steps of the process to show: (1) she is not engaged in "substantial gainful activity"; (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and (3) her impairment(s) meet or equal one of the listings in Appendix 1, Subpart P of 20 C.F.R. Pt. 404; or (4) pursuant to the assessment of the claimant's residual functional capacity (RFC), she is unable to perform her past relevant work. 20 C.F.R § 404.1520(a)(4)(i-iv); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (citations omitted). "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of her medical impairments." *Ryan v. Colvin*, Civ. 15-0740 KBM, 2016 WL 8230660, at *2 (D.N.M. Sept. 29, 2016) (citing 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); 20 C.F.R. § 404.1545(a)(1)). If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" the claimant retains sufficient RFC "to perform work in the national economy, given [her] age, education, and work experience." *Grogan*, 399 F.3d at 1261 (citing *Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988) (internal citation omitted)); *see also* 20 C.F.R. § 404.1520(a)(4)(v).

At Step One of the process, ALJ Richter found that Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of December 17, 2013[,] through her date last insured of March 31, 2015." AR at 18 (citing 20 C.F.R. §§ 404.1571-1576). At Step Two, the ALJ concluded that "[t]hrough the date last insured, [Plaintiff] had the following severe impairments: degenerative disc disease of the lumbar/cervical spine, chronic pain syndrome, COPD, patellofemoral

chondromalacia of the right knee, lateral condyle contusion of the right knee, obesity, depression, vertigo, and insomnia." AR at 18 (citing 20 C.F.R. § 404.1520(c)). ALJ Richter also noted the following nonsevere impairments: "hypertension, hypothyroid, Reynaud's disease, right-shoulder pain[,] and gout." AR at 18.

At Step Three, the ALJ found that "[t]hrough the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." AR at 18 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). At Step Four, the ALJ considered the evidence of record, including records from David Liscow, M.D., South Haven Family Physicians, Gila Regional Medical Center, Joanne Cardinal, M.D., Michelle Pahl, M.D., Sravanthi Reddy, M.D., Roberto Carreon, M.D., Eliza Cain, M.A., LPCC, function reports from Plaintiff and her husband, and testimony from Plaintiff. AR at 20-24.

ALJ Richter found that "[t]hrough the date last insured, [Plaintiff] was unable to perform any past relevant work." AR at 24 (citing 20 C.F.R. § 404.1565). Ultimately, the ALJ found that through the date last insured, Plaintiff

> has the [RFC] to occasionally lift 20 pounds and . . . frequently lift or carry up to 10 pounds. [She] is able to stand and walk for approximately six hours in an eight-hour workday and sit for six hours in an eight-hour workday. She can occasionally stoop, kneel, crouch, crawl and climb ramps or stairs but can never balance or climb ladders, ropes or scaffolds. [She] cannot be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes or pulmonary irritants. She is limited to work performed primarily at the work station in a routine environment with few changes in the routine work setting. She can have occasional interaction with supervisors, coworkers and members of the public. . . . [T]his is a limited range of work contained in the light exertional level as defined by 20 [C.F.R. §§] 404.1567 [and] 416.967 and SSR 83-10.

AR at 20, 24. The ALJ determined that, through the date last insured, Plaintiff could have performed the jobs of Hand Presser and Conveyor-line Bakery Worker. AR at 24-25. Relying on testimony of the VE, the ALJ concluded that "considering [Plaintiff's] age, education, work experience, and [RFC], [Plaintiff] was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." AR at 25. Ultimately, ALJ Richter found that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from December 17, 2013, the alleged onset date, through March 31, 2015, the date last insured." AR at 25 (citing 20 C.F.R. § 404.1520(g)).

## III.    Legal Standard

The Court must "review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (internal citation omitted)). A deficiency in either area is grounds for remand. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161, 1166 (citation omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172 (internal quotation omitted)). "It requires more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004) (internal quotation omitted) (alteration in original)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the

Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (internal quotation marks and quotations omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200 (internal quotation omitted)).

## IV. Discussion

Plaintiff contends that the following three issues require reversal of the ALJ's decision: (1) the ALJ erroneously believed that Plaintiff's right knee pain arose only after the date last insured; (2) "the ALJ ignored, misrepresented, or minimized significant medical evidence" that she rejected; and (3) the ALJ failed to obtain an explanation from the VE regarding the listed occupations. *Doc. 16* at 1-2.

### A. The ALJ adequately accounted for the limiting effects of Plaintiff's right knee pain.

#### 1. The ALJ's error regarding Plaintiff's right knee pain.

Plaintiff alleged a variety of impairments on her application for benefits, but the only impairment relevant to this issue involves Plaintiff's right knee pain. Plaintiff originally alleged an onset date of September 1, 2012. AR at 99. During the hearing with ALJ Richter, however, Plaintiff asked to amend the onset date to December 17, 2013, and the ALJ granted her request. *Doc. 16* at 12; AR at 15, 95-96. Plaintiff attributes the

amendment to her knee injury, which she first reported in early 2014 after a pre-Christmas 2013 fall. *Doc. 16* at 12-13; AR at 95-96.

ALJ Richter outlined the evidence of Plaintiff's right knee pain throughout her decision. At the conclusion of her decision, however, ALJ Richter made the following statement:

> Regarding knee pain, the record contains a specific time period of onset, December 2013, which falls after the date last insured. Prior to that, x-rays and ultrasounds of the lower-right extremity were normal. . . . However, because there is a slim possibility that the bone-marrow edema identified on a later MRI existed into the insured period, the [ALJ] has also limited [Plaintiff's] stooping, kneeling, crouching and crawling.

AR at 24. Thus, the ALJ misstated the onset date of Plaintiff's right knee pain as occurring "*after the date last insured.*" AR at 24 (emphasis added).

Plaintiff argues that the ALJ's misstatement has made judicial review impossible and rendered the resulting RFC invalid. *Doc. 16* at 12-14. The Commissioner contends that a thorough reading of ALJ Richter's entire opinion demonstrates that she adequately examined the relevant evidence, and the RFC correctly reflects Plaintiff's right knee limitations. *Doc. 23* at 10-12. The Court agrees with the Commissioner – it is clear from the opinion that ALJ Richter examined the relevant evidence regarding Plaintiff's knee pain. Moreover, Plaintiff has not shown that the ALJ's error has resulted in any prejudice, because Plaintiff has not demonstrated that the ALJ should have included further limitations due to her right knee pain. *See*, *e.g.*, *Keyes-Zachary*, 695 F.3d at 1162-63 (finding that an "alleged error in the ALJ's decision did not . . . prejudice [plaintiff], because giving greater weight to [a physician's] opinion would not have helped her").

## 2. Record evidence of Plaintiff's right knee pain.

The Court has located five relevant medical records, including four office visits and one MRI, that are relevant to Plaintiff's knee pain for the dates in question: (1) the initial January 3, 2014 appointment with Joanne Cardinal, M.D., to assess the knee injury after Plaintiff's pre-Christmas injury (AR at 394-96); (2) a January 8, 2014 appointment with Sravanthi Reddy, M.D. at Southwest Bone & Joint Institute (AR at 433-35); (3) the January 10, 2014 MRI with Tan M. Nguyen, M.D. (AR at 436); (4) a January 13, 2014 follow-up appointment after the MRI with Roberto Carreon, M.D. (AR at 437); and (5) a June 20, 2014 appointment with Michelle T. Pahl, M.D. (AR at 399-402). Notably, ALJ Richter examined each one of these medical records in her opinion. *See* AR at 22-23.

At her January 3, 2014 appointment, Dr. Cardinal's notes reflect that Plaintiff's "right knee locked up on her before Christmas" resulting in a "jarring impact to [her] knee . . . ." AR at 394; *see also* AR at 22. Plaintiff complained of pain, swelling, locking and catching, and a giving way sensation. AR at 394; *see also* AR at 22. Dr. Cardinal noted "no dependent edema[,]"a "limited range of motion[,] tenderness[,] and swelling," but was "unable to check [her] ligaments due to pain." AR at 394; *see also* AR at 22. Dr. Cardinal observed that Plaintiff was "leaning on [her] left side" and was "almost manic [and] demanding about her knee and the possibility her knee pain is from her back even though she has had a recent knee injury with swelling [and] effusion." AR at 394-95; *see also* AR at 22. Dr. Cardinal advised Plaintiff to obtain an MRI. AR at 395.

Plaintiff next visited Sravanthi Reddy, M.D. on January 8, 2014, for her knee pain. AR at 433-35. Plaintiff complained of popping, catching, and pain with walking. AR

at 433. On examining Plaintiff's right leg, Dr. Reddy noted no atrophy and no effusion in the right knee, but observed "tenderness to palpation in the lateral joint line." AR at 434; *see also* AR at 22. Dr. Reddy assessed a negative Lachman's test, a knee range of motion of 3-120 degrees of flexion, a positive McMurray's test laterally, and a negative straight leg raising test. AR at 434; *see also* AR at 23. Dr. Reddy noted that "[t]esting for ligamentous laxity with valgus and varus stress testing [was] negative." AR at 434. The examination notes reflect that an x-ray (AP/Lat) of the right knee showed normal findings. AR at 434; *see also* AR at 22. Dr. Reddy suspected that Plaintiff may have sustained a left lateral meniscus tear and ordered an MRI. AR at 434; *see also* AR at 23.

Plaintiff underwent an MRI of her right knee on January 10, 2014, with Tan M. Nguyen, M.D. AR at 436; *see also* AR at 23. Dr. Nguyen found "[b]one marrow edema centered in the lateral femoral condyle most compatible with contusion" but "[n]o evidence of [a] meniscal tear or ligamentous injury[,]" and patellar chondrosis. AR at 436; *see also* AR at 23.

On January 13, 2014, Plaintiff attended a follow-up appointment with Roberto Carreon, M.D. at Southwest Bone & Joint Institute. AR at 437; *see also* AR at 23. Dr. Carreon noted Plaintiff's report "that the pain that she was having at the knee has now improved a great deal." AR at 437. Plaintiff did complain of some "pain mostly on the medial side . . . [,] but it is improved." AR at 437. Dr. Carreon observed intact motor function bilaterally, "some tenderness to palpation along the lateral side of the knee . . . at the condyle region" and "extending all the way down to the tibia . . . ." AR at 437. Plaintiff's "range of motion is from 0 degrees of extension to about 120 degrees of

flexion." AR at 437. Plaintiff had a negative Lachman's test and "some mild generalized edema on the right knee." AR at 437. Dr. Carreon assessed "a contusion of the lateral condyle" and advised Plaintiff "that it could produce some long-term problems if this collapses and leaves her with some irregularity of the joint line . . . ." AR at 437. Dr. Carreon advised Plaintiff to follow up with x-rays, continued use of a knee brace, ice, elevation, and anti-inflammatory medication while advancing her activities slowly. AR at 437. Dr. Carreon noted that he would see Plaintiff in six weeks to follow up and repeat x-rays of her right knee, but the only other record of a visit relevant to Plaintiff's right knee is with Dr. Michelle Pahl on June 20, 2014, more than 22 weeks past this visit with Dr. Carreon.[4] *See* AR at 399.

Finally, that visit with Dr. Pahl, M.D. was to establish care, obtain a medication refill, and have a spot on her chest examined. AR at 399-402. Dr. Pahl noted that Plaintiff takes Diclofenac as an anti-inflammatory for her knee as needed. AR at 399. Dr. Pahl advised Plaintiff that she was unwilling to prescribe her narcotic medication for any chronic pain. AR at 401. There are no notes from this appointment to show that Plaintiff specifically complained of knee pain. *See* AR at 399-402.

> **3.  The Court finds no legal error in the ALJ's decision regarding Plaintiff's right knee pain.**

ALJ Richter adequately examined the evidence of Plaintiff's right knee pain. The ALJ discussed both Plaintiff's testimony and all five medical records directly related to

---

[4] The Court notes an April 13, 2016 visit with Dr. Carreon, in which he notes a "full range of motion" in both of Plaintiff's knees (AR at 529) and "knees, ankles and feet stable and no subluxation, dislocation" (AR at 530).

Plaintiff's knee pain and related the findings of each physician.[5] *See* AR at 22-24. The ALJ's RFC findings are supported both by substantial evidence and by the opinions of state agency physicians Claire Horn, M.D. and Michael Slager, M.D., who reviewed the evidence at both the initial and reconsideration levels and found Plaintiff could perform light work with occasional limitations on her ability to stoop, kneel, crouch, and crawl. *See* AR at 105-08, 116-17.

Plaintiff argues that the ALJ's misstatement regarding the onset date constitutes legal error, but the Court disagrees – the ALJ's misstatement was a simple factual error and was "not a substantive failure to consider all the relevant evidence." *See Jackson v. Colvin*, No. 11-cv-02455-PAB, 2014 WL 718059, at *2 (D. Colo. Feb. 24, 2014); *see also Doc. 24* at 2. More importantly, because ALJ Richter explicitly took Plaintiff's knee pain into account in formulating the RFC by limiting her to only occasional stooping, kneeling, crouching and crawling, Plaintiff has failed to show that she was prejudiced by the ALJ's misstatement regarding the onset date. AR at 20, 24. "Where, as here, [the Court] can follow the adjudicator's reasoning in conducting [its] review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary*, 695 F.3d at 1166. Accordingly, the Court recommends rejecting Plaintiff's Motion on this issue.

---

[5] Plaintiff contends that the ALJ failed "to consider the January 2014 right knee MRI . . . ." *Doc. 16* at 14. The Court disagrees. ALJ Richter mentioned that Dr. "Reddy suspected a tear of [Plaintiff's] left lateral meniscus[,]" but the January 2014 "MRI proved no tear existed while simultaneously finding bone-marrow edema and cartilage thinning of the lateral patellar facet." AR at 23 (citing AR at 436 (Jan. 10, 2014 MRI)).

**B. The ALJ adequately discussed the record evidence in Plaintiff's favor.**

Plaintiff contends that ALJ Richter "ignored, misrepresented, or minimized significant medical evidence" in Plaintiff's favor. *Doc. 16* at 16. Specifically, Plaintiff argues that the ALJ: (1) entirely ignored Plaintiff's treatment with John A. Flores, M.D., (2) misrepresented the December 2014 cervical spine x-rays findings, and (3) minimized findings from a December 2012 MRI of Plaintiff's lumbar spine. *Id.* at 16-17.

**1. The ALJ adequately examined the records from Dr. Flores.**

Plaintiff saw Dr. Flores seven times for chronic pain management between September 17, 2014, and March 30, 2016. Thereafter, she had to find a new provider because Dr. Flores's license was suspended. *See* AR at 68, 467-80, 547-55. Dr. Flores assessed a history of fatigue, polyarthralgia, neuropathy, and chronic back pain on September 17, 2014 (AR at 478), and added polyglandular dysfunction on September 29, 2014 (AR at 475). Dr. Flores treated Plaintiff for her chronic pain complaints and other diagnoses with a number of medications. *See* AR at 303 (listing medications prescribed by Dr. Flores for pain, blood pressure and edema, dizziness and nausea, angina and blood pressure, depression, and hypothyroidism), 312-13 (listing medications prescribed by Dr. Flores for Reynaud's Syndrome, hypertension/edema, pain, cramps, hypertension/angina, nerve pain, COPD, hypothyroidism, and insomnia).

Plaintiff contends that ALJ Richter "ignored, entirely, [Plaintiff's] treatment with" Dr. Flores. *Doc. 16* at 16. Yet the ALJ specifically cited to Dr. Flores's records in at least three places. First, ALJ Richter noted that the cervical spine imaging Dr. Flores ordered was "unremarkable" (AR at 22) in that the findings revealed "[c]ervical vertebral body

heights and disc spaces are preserved and alignment is satisfactory[, s]mall osteophytes of the endplates and mild facet hypertrophy at multiple levels[,]" and "no soft tissue swelling" (AR at 490). Second, the ALJ discussed notes from Plaintiff's visit with Dr. Flores on April 8, 2015, in which she stated that she had "increased pain in the low back after gardening." AR at 24, 467. Finally, the ALJ cited to a March 30, 2016 visit with Dr. Flores and discussed Plaintiff's ability to control her pain with medications, allowing her to maintain her activities of daily living. AR at 21, 24 (citing AR at 549).

To the extent that the ALJ did not explicitly discuss the remaining visits with Dr. Flores, the Court finds no reversible error. "While '[t]he record must demonstrate that the ALJ considered all of the evidence,' there is no requirement that an ALJ 'discuss every piece of evidence.'" *Bales v. Colvin*, 576 F. App'x 792, 797 (10th Cir. 2014) (quoting *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014) (internal quotation omitted)). Plaintiff "points to evidence that she claims the ALJ failed to discuss, but for the most part she does not say why it was significantly probative . . . ." *See Mays*, 739 F.3d at 576. At most, Plaintiff contends that Plaintiff's treatment from Dr. Flores is significant to bolster her complaints of pain and its disabling effects. *Doc. 16* at 16-17.

While Plaintiff did not initially argue that the ALJ erred in her credibility assessment, the Commissioner included an analysis of the ALJ's credibility assessment in her Response, and Plaintiff responded at length in her Reply. *See Docs. 23* at 8-9; *24* at 5-10. Plaintiff argues that the ALJ's credibility assessment contains the following legal errors: (1) the ALJ ignored "significant limitations" in Plaintiff's function report "that contradict the ALJ's findings that [Plaintiff] 'remains able to perform her activities of daily living in additional [sic] to other activities such as gardening and exercise'" (*Doc. 24* at 7

(quoting AR at 24)); (2) the ALJ ignored Plaintiff's hearing testimony (*id.* at 8-9); (3) the ALJ failed to consider why Plaintiff was unable to obtain more extensive treatment (*id.* at 9); (4) the ALJ "misrepresented the reasons that [Plaintiff] stopped working" (*id.*); and (5) the ALJ and the Commissioner erroneously relied on medical evidence from before Plaintiff's 2013 fall to "refute the assertion that [Plaintiff's] right knee pain caused significant limitations" (*id.* at 10 (citing *Doc. 23* at 11; AR at 23-24)). The Court will examine each of these arguments in turn.

### a. The ALJ adequately assessed Plaintiff's function report.

Plaintiff argues that her statements on the function report support a finding that she has significant limitations that contradict the ALJ's decision. *Doc. 24* at 7-8 (citing AR at 282, 285, 288). Plaintiff specifically disagrees with the ALJ's statement that Plaintiff is able to garden and exercise. *Doc. 24* at 7; *see also* AR at 24. The Court agrees that Plaintiff's testimony about gardening was in reference to a period after her date last insured (*see* AR at 467-69 (notes from April 8, 2015 visit in which Plaintiff complains of lower back pain after gardening)), but the Court disagrees that the ALJ so strayed from Plaintiff's function report as to constitute legal error.

As the ALJ pointed out, there is ample evidence to support the finding that Plaintiff's limitations were controlled with medication and she was able to perform her activities of daily living. *See* AR at 85, citing 430 (notes from Nov. 29, 2012 discharge summary stating that "[p]ain is much better[,]" "able to get up and walk around with minimal discomfort"), 467 (notes from April 8, 2015 visit with Dr. Flores, who noted "[p]ersistent but tolerable discomfort on medication[, c]ontinue on current medication without dosing change"), 549 (notes from March 30, 2016 visit with Dr. Flores, who

noted that "Patient is able to pursue normal daily activities of daily living without restriction"); *see also*, *e.g.*, AR at 85 (Plaintiff testified at hearing that her medications "help with the level of functioning that you would have for" activities of daily living), 389 (June 18, 2013 visit with Dr. Cardinal, who noted that Plaintiff is "[a]ble to perform household duties, [p]erforms" activities of daily living).

Plaintiff contends that her responses to "the function report also contradict the ALJ's finding that [she] goes outside on a daily basis." *Id.* (quoting AR at 21 (internal quotation marks and brackets omitted). The Court observes that on her function report, under Section B, "Information about daily activities," Plaintiff recited that she "walk[s] outside for a few minutes." AR at 281. Thus, the Court disagrees with Plaintiff's contention that the function report contradicts ALJ Richter's finding that Plaintiff goes outside on a daily basis.

Finally, Plaintiff argues that the ALJ overstated her social activities, which do not "approach the exertional requirements of light work." *Doc. 24* at 8 (citing AR at 21); *Doc. 23* at 10. Plaintiff fails to provide any further explanation about what part of the ALJ's decision she refers to here, and it is not clear to the Court where the ALJ overstated Plaintiff's social activities. On the page to which Plaintiff cites, the ALJ found that Plaintiff has "difficulty trusting people and overall poor social interaction." AR at 21. The ALJ noted several observations from Plaintiff's husband's function report, including that "on good days, [Plaintiff] can go shopping, take care of pets and do chores around the house[,]" and she "interacts with friends via phone and e-mail." AR at 21. The Court finds no other mention of social activities, nor does Plaintiff point to any. Plaintiff's argument on this point is without merit.

**b.    The ALJ did not ignore the Plaintiff's hearing testimony.**

Plaintiff next argues that the ALJ failed to acknowledge Plaintiff's testimony at the hearing. *Doc. 24* at 8-9. Again, the Court disagrees. ALJ Richter explicitly discussed Plaintiff's hearing testimony in her decision. AR at 21. The record is clear that the ALJ considered all of the hearing testimony, even though she may not have discussed every moment of the hearing. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

**c.    The ALJ considered Plaintiff's inability to obtain further treatment.**

As the Commissioner points out, "the ALJ observed [Plaintiff's] treatment notes were sparse and showed a lack of consistent complaints of symptoms over time, particularly in the relevant period." *Doc. 23* at 9 (citing AR at 22-24). The Commissioner further notes that "an ALJ may consider 'the extensiveness of the attempts (medical or nonmedical) to obtain relief . . . .'" *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (internal citations omitted)). Plaintiff contends that the ALJ's observation ignored Plaintiff's testimony at her hearing, where she explained that part of the reason she has not received all necessary treatment is because she lives in a small town without the necessary providers, and that she would need to go out of state for a back surgery that was discussed as an option. *See Doc. 24* at 9; AR at 77-79, 84.

However, the ALJ also observed that "[p]rior to the date last insured, the primary evidentiary weaknesses are the fleeting nature of most complaints and a dearth of clinical signs that doctors could observe." AR at 23. Thus, the ALJ was not just basing her determination on the number of visits, but also on the clinical signs that doctors observed when Plaintiff was able to visit a doctor. The ALJ specifically noted that

Plaintiff's complaints were "episodic in nature, focused on one symptom at a time and, apparently, the other complaints were not coexistent." AR at 23. Thus, the ALJ considered Plaintiff's complaints to doctors when she visited, not only the fact that her visits were sporadic. Accordingly, the Court finds no legal error that requires reversal.

### d. The ALJ did not misrepresent the reasons Plaintiff stopped working.

Plaintiff next argues that she gave the ALJ a variety of reasons to explain why she stopped working, yet the ALJ only mentioned her move to New Mexico in the decision. *Doc. 24* at 9; *see also* AR at 41-43. Plaintiff maintains this was error.

At the hearing, Plaintiff reported that she worked from July through September 2012, as a home care LPN, first for a baby and later for a paralyzed man. AR at 40-43. Plaintiff explained that she quit the job with the baby due to the job's physical demands, and because her drive to that work took her past the site where her daughter was killed in a fatal car accident. *See* AR at 40-42. She quit the position with the paralyzed man after only two to three weeks because it was difficult for her to pull and lift the man. AR at 42-43. Plaintiff testified later at the hearing that she left a job with a private nursing service in Michigan when her husband accepted a job in Lubbock. AR at 81 (ALJ asked: "And your *last* job was Advantage Private Nursing. Is that right?" Plaintiff: "Yes." (emphasis added)). It is unclear when this particular job ended, but her medical records through September 2012 show that she was in Michigan. It is possible that the job she referenced with respect to her move is the same job with the paralyzed man that she quit due to physical demands. Plaintiff failed to make this clear either at the hearing or in

her brief, however, and the Court finds no legal error in the ALJ's finding that she left her job in Michigan due to her husband's own relocation to Lubbock.

> **e.** **The Court finds no reversible error in the ALJ's reliance on medical evidence that pre-dates Plaintiff's right knee injury.**

Finally, Plaintiff argues that the ALJ and Commissioner used medical records prior to Plaintiff's right knee injury to "refute the assertion that [Plaintiff's] right knee pain caused significant limitations." *Doc. 24* at 10 (citing *Doc. 23* at 11; AR at 22, 23). Specifically, Plaintiff refers to the ALJ's and Commissioner's reliance on a November 2012 x-ray of Plaintiff's right hip "performed to rule out deep vein thrombosis," a chest CT, and evidence that Plaintiff's "complaints had a 'fleeting nature.'" *Id.* (citing AR at 22, 24, 95-96, 347-50, 355, 359-60, 365, 389-93).

Plaintiff reads the ALJ's decision on this issue too narrowly. First, ALJ Richter's comment regarding the "fleeting nature" of Plaintiff's complaint referred to *all* of her limitations, not only to her right knee pain. *See* AR at 23. ALJ Richter explained why Plaintiff's complaints were transient by summarizing Plaintiff's visits with Drs. Liscow and Cardinal, noting that Plaintiff's complaints were "episodic in nature, focused on one symptom at a time and, apparently, the other complaints were not coexistent." AR at 23.

The ALJ did cite to the range of records from Gila Regional Medical Center dated November 30, 2012, through June 4, 2014, in reference to Plaintiff's complaints of right knee pain. *See* AR at 24 (citing AR at 356-78). ALJ Richter observed that prior to Plaintiff's fall in December 2013, "x-rays and ultrasounds of the lower-right extremity were normal." AR at 24 (citing AR at 356-78). Plaintiff points to November 29, 2012 records of an x-ray of her right hip and an ultrasound of her right leg, both of which fall

within the page range the ALJ cited. *Doc. 24* at 10 (citing AR at 359-60). Plaintiff

contends that the "ultrasound was only performed to rule out deep vein thrombosis, not

to evaluate [her] right knee[,]" which is true, but the findings did apply to her "right lower

extremity" and were "normal," as the ALJ mentioned. *See id.*; AR at 360. At any rate,

Plaintiff fails to establish that the ALJ's comments resulted in any prejudice, as

substantial evidence supports the ALJ's decision about Plaintiff's right knee limitations.

For the foregoing reasons, the Court declines to find reversible error in the ALJ's

credibility determination.

### 2. Cervical spine x-rays.

Plaintiff argues that "the ALJ misrepresented the findings on [Plaintiff's] cervical

spine x-rays, taken December 4, 2014 . . . ." *Doc. 16* at 17 (citations omitted); *see also*

AR at 22. The ALJ stated that these findings were "unremarkable." AR at 22. Plaintiff

contends it was error for ALJ Richter to fail to explain why she rejected the findings.

*Doc. 16* at 17 (citing *Clifton*, 79 F.3d at 1010).

Plaintiff saw Dr. Flores on December 4, 2014, for a follow-up visit due to chronic

back pain. *See* AR at 470-73. Dr. Flores apparently ordered the cervical spine x-rays,

but there are no comments regarding the x-rays in his treatment notes. *See* AR at 470-

73, 490. The findings from the cervical spine x-rays showed "[c]ervical vertebral body

heights and disc spaces are preserved and alignment is satisfactory. Small osteophytes

of the endplates and mild facet hypertrophy at multiple levels are seen. There is no soft

tissue swelling." AR at 490. Ultimately, the doctor who provided these findings

concluded that there were "[m]ild degenerative changes . . . ." AR at 490.

It is noteworthy that Plaintiff did not return to Dr. Flores for over four months. *See* AR at 467-69 (notes from April 8, 2015 visit). While Dr. Flores mentioned the findings from the cervical spine x-rays, it does not appear that Dr. Flores saw cause for any additional medication or therapy due to those findings. *See* AR at 467 (Plaintiff is to "[c]ontinue on current medication without dosing change"). Dr. Flores did recommend a tai chi program, but it was for "pelvic stabilization." AR at 467. Dr. Flores also "[e]ncourage[d] conservative treatment[,]" but it was in response to Plaintiff's complaints of "[m]ild exacerbation after gardening." AR at 467.

Plaintiff has failed to demonstrate that the findings of her cervical spine x-rays require a more limited RFC finding.

### 3.     MRI of lumbar spine

Plaintiff underwent two MRIs of her lower spine in 2012: the first was limited, because Plaintiff stopped the procedure due to claustrophobia. *See* AR at 361. The second revealed the following findings:

> Slight levoconvex curvature may be present. There is no evidence of fracture or ligamentous disruption. Conus medullaris is unremarkable. The visualized thoracic spine is normal.
> L1-2: Unremarkable.
> L2-3: Degenerative disc disease with some reactive endplate change. Small right paracentral disc extrusion effaces the right lateral recess and extends into the right sided neural foramen creating moderate right-sided neural foraminal narrowing.
> L3-4: Unremarkable.
> L4-5: Unremarkable.
> L5-S1: Right greater than left sided facet arthrosis. Tiny central disc protrusion may be seen. No appreciable central canal or neural foraminal narrowing.

AR at 410. Plaintiff contends that the ALJ's analysis of these MRIs requires reversal. *Doc. 16* at 17 (citing AR at 22-23).

The ALJ discussed findings from both MRIs, noting the disc protrusion, "a broad-based right paracentral and neural foraminal extrusion" at L2-3, which created "some neural-foraminal narrowing." AR at 22 (citing AR at 410). Plaintiff argues that the ALJ's reference to "*some*" as opposed to "*moderate*" neural-foraminal narrowing "minimized the significant findings . . . ." *Doc. 16* at 17-18. The Court finds this argument is a stretch. The ALJ adequately discussed these findings, the evidence of Plaintiff's back pain as a whole, and her reasons for formulating Plaintiff's RFC. Moreover, Plaintiff fails to develop an argument to establish that these MRI findings support a more limited RFC than the one ALJ Richter assessed. It appears that Plaintiff simply asks the Court to reweigh the evidence; this the Court may not do.

### C.     The Court finds no reversible error at Step Five.

Finally, Plaintiff argues that the ALJ "committed reversible error at step five of the sequential analysis by adopting testimony of the [VE] that directly conflicted with the DOT and SCO without obtaining a reasonable explanation for the conflict." *Doc. 16* at 18. Specifically, Plaintiff contends: (1) the Dictionary of Occupational Titles (DOT) and Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO) "description[s] for 'Bakery Worker' requires exposure to moving mechanical machinery, which is inconsistent with the ALJ's hypothetical question to the VE and the RFC"; and (2) "[t]he DOT and SCO description[s] for 'Presser, hand' requires exposure to dust, odors[,] fumes, or pulmonary irritants, which is inconsistent with the [ALJ's] hypothetical question to the VE and the RFC." *Doc. 16* at 21, 23. Plaintiff maintains that the ALJ erred in failing to obtain an explanation for these discrepancies.

### 1. It was error for the ALJ to accept the Bakery Worker position without asking the VE for further explanation.

Plaintiff first argues that the job of Bakery Worker includes an environmental condition for which Plaintiff's RFC contains limitations. *Doc. 16* at 21-23. The Court agrees. The DOT explains that a Bakery Worker will have "occasional" exposure to moving mechanical parts. *See* SCO at 486, Part B, *available at* https://www.nosscr.org/sco/sco-ocr.pdf (last visited Feb. 2, 2018). "Occasional" exposure means up to one-third of the time. SCO, App'x C at C-3 (defining "Occasionally" to mean "Activity or condition exists up to 1/3 of the time"). Occasional exposure to moving mechanical parts conflicts with Plaintiff's RFC, which states that she "cannot be exposed to . . . moving mechanical parts . . . ." AR at 20. The Commissioner admits that "the job of 'conveyor-line bakery worker' may be inconsistent with the Plaintiff's RFC if it requires occasional exposure to moving mechanical machinery." *See Doc. 23* at 14 n.5. Because the ALJ did not "investigate and elicit a reasonable explanation for [this] conflict between the Dictionary and [the VE's] testimony[,]" it was legal error for the ALJ to accept this position to support a determination of nondisability. *See Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999). The Court finds this error does not in itself mandate reversal, however, because the ALJ identified other jobs that exist in significant numbers in the national economy that Plaintiff could perform.

### 2. The Court finds that significant jobs exist in the economy for the remaining job identified.

Plaintiff's final, two-pronged argument relates to the second job the VE identified – that of Hand Presser. First, Plaintiff asserts that while the VE stated the second job as

Hand Presser, the VE gave a DOT number for another position – Hat Blocker – which does not conform with Plaintiff's RFC. *Doc. 16* at 23-24. Plaintiff argues that it was reversible error for the ALJ to accept this position. The Commissioner maintains, and the Court agrees, that the VE's misidentification of the DOT number (Presser, Hand is 363.684-01**8**; Hat Blocker is 363.684-01**4**) is a technical error, and it was clear from the remainder of the VE's testimony regarding the level of work (light, unskilled) that the VE intended to identify the Hand Presser position. *See Doc. 23* at 14-15; *see also* AR at 93.

Plaintiff next posits that because the VE identified only 50,000 jobs nationally for the Hand Presser position, this case requires remand so that the ALJ may perform an analysis of the *Trimiar* factors to determine whether the number of positions rises to the significant level as defined in 42 U.S.C. § 423(d)(2)(A). *See Doc. 24* at 11-12; *Trimiar v. Sullivan*, 966 F.2d 1326 (10th Cir. 1992). The Commissioner argues that 50,000 jobs nationally represents a significant number and remand is unnecessary. *See Doc. 23* at 15. The Court agrees, because it finds *Trimiar* is inapposite to this case.

In *Trimiar v. Sullivan*, the Tenth Circuit noted a number of factors courts may consider in evaluating whether the number of **regional** jobs is significant, "including: (1) the level of claimant's disability; (2) the reliability of the vocational expert's testimony; (3) the distance claimant is capable of traveling to engage in the assigned work; (4) the isolated nature of the jobs; and, (5) the types and availability of such work." *Padilla v. Berryhill*, No. 16-106 KK, 2017 WL 3412089, at *11 (D.N.M. Mar. 28, 2017) (citing *Trimiar*, 966 F.2d at 1330). The "multi-factorial analysis" required by *Trimiar* focuses on factors relevant in analyzing the true "availability" of local job opportunities on a more particularized inquiry as to the specific claimant under consideration. That seems quite

logical in the context of assessing truly "available" jobs regionally. Where the focus is on national availability of jobs, however, the particularized *Trimiar* inquiry would confuse the issues.

Moreover, as the post-*Trimiar* Tenth Circuit has explained, "the controlling statutes, federal regulations, and case law all indicate that the proper focus generally must be on jobs in the national, not regional, economy."[6] *Raymond*, 621 F.3d at 1274. "In fact, the Sixth Circuit in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir.1999), explicitly stated that '[t]he Commissioner is not required to show that job opportunities exist within the local area.'" *Id.* Thus, the *Raymond* court found "no reasoned basis" for reaching a different result even where a VE had identified only 385 jobs available statewide. *Id.*

Here, the ALJ did not have occasion to comment on whether 50,000 jobs represents a significant number in the national economy, because the ALJ mistakenly concluded that there were 450,000 jobs available to Plaintiff. "The question for the court is whether, on the facts of this case, the ALJ's error regarding the number of jobs that plaintiff can perform given the RFC limitations established by the ALJ constitutes harmless error." *See Pemberton v. Berryhill*, No. 16-2501-SAC, 2017 WL 1492934, at

---

[6] The *Raymond* court further detailed its rationale:

> In 42 U.S.C. § 423(d)(2)(A), for example, Congress prescribed that "[a]n individual shall be determined to be under a disability only if . . . [he cannot] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country." *Id.* (emphasis added).

*Raymond*, 621 F.3d at 1274.

*3 (D. Kan. Apr. 26, 2017); *see also Ferguson v. Berryhill*, No. 16-1348-SAC, 2017 WL 2536436, at *4-*6 (D. Kan. June 21, 2017).

To answer this question, the Court looks to other persuasive authorities that have addressed the question of when one can find that a certain number of jobs in the national economy can qualify as a "significant number." The Ninth Circuit specifically found that "25,000 jobs meets the statutory standard" as a nationally significant number if the jobs are available in several regions of the country. *Gutierrez v. Comm'r of Soc. Sec.,* 740 F.3d 519, 528-29 (9th Cir. 2014). The Eighth Circuit expressly upheld an ALJ's determination that 30,000 jobs constitute a significant number in the national economy. *Long v. Chater,* 108 F.3d 185, 188 (8th Cir. 1997). The District of Colorado has held that 26,000 jobs nationally is a significant number. *Jackson v. Colvin*, No. 13-cv-01927-KLM, 2014 WL 5504755, at *9 (D. Colo. Oct. 31, 2014) (gathering cases where courts have held that, as a matter of law, a significant number of jobs exist in the national economy). I very recently found that 47,500 jobs was a significant number. *See King v. Berryhill*, 16-cv-01147-KBM, Mem. Op. & Order at 25-29 (D.N.M. Feb. 12, 2018). I also agree with Magistrate Judge Khalsa from this District that the Tenth Circuit implicitly found 11,000 nationally available jobs to be a significant number in the *Rogers* case.[7] *See Padilla*, 2017 WL 3412089, at *12 (discussing *Rogers v. Astrue,* 312 F. App'x 138, 142 (10th Cir. 2009)).

---

[7] The VE in *Rogers* explained an apparent conflict between the DOT and the VE's testimony by detailing that "in his professional experience, 11,000 sedentary hand packer jobs existed in the national economy . . . ." *Rogers*, 312 F. App'x at *140. The Tenth Circuit held that "the ALJ could rely on **that** testimony as substantial evidence to support her determination of nondisability." *Id.* (emphasis added). It appears, therefore, that the *Rogers* Court implicitly found 11,000 jobs a significant number. Indeed, the Tenth Circuit so noted in an unpublished 2016 decision. *Evans v.*

In making these observations, I am fully cognizant of the often-quoted words of caution given by the Tenth Circuit to its lower courts:

> This court has made it clear that judicial line-drawing in this context is inappropriate, that the issue of numerical significance entails many fact-specific considerations requiring individualized evaluation, and, most importantly, that the evaluation "should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation."

*Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004) (citing *Trimiar*, 966 F.2d at 1330). That powerful warning, however, came in the context of evaluating only whether 100 **statewide** jobs constitute a significant number in the local economy. *Id.* Because the ALJ in *Allen* had failed to perform the more searching *Trimiar* assessment as to those regional jobs, the lower court appropriately remanded. Of significance here, the availability of jobs in the **national** economy played no role in the *Allen* analysis.

The Court is also aware that it "should apply the harmless error analysis cautiously in the administrative review setting." *Id.* (citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005)). It finds, however, that where there are 50,000 jobs available in the national economy, the Court can "confidently say that no reasonable factfinder, following the correct analysis, could have resolved the factual matter in any

---

*Colvin*, 640 F. App'x 731, 735 (10th Cir. 2016) ("we implied [in *Rogers*] that 11,000 national jobs was a significant number").

Of course, as an unpublished Order and Judgment, the *Rogers* decision is not precedential even though it can be appropriately cited for its persuasive value. *See* Fed. R. App. P. 32.1(A); 10th Cir. R 32.1(A). In *Evans*, the Tenth Circuit panel affirmed the lower court's finding that *Rogers* was unpersuasive because "the figure [at issue in *Rogers*] was stated in dictum and harmless error was not at issue." *Id.* The Tenth Circuit did not dispute this assertion by the district court.

other way." *Pemberton*, 2017 WL 1492934, at *3 (citing *Fischer-Ross*, 431 F.3d at 733-34; *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).[8]

In summary, the Court finds that the *Trimiar* analysis does not extend to the question of whether there are significant numbers of **nationally** available jobs that a claimant can perform. *See Padilla,* 2017 WL 3412089, at *12 (citing *Raymond v. Astrue*, 356 F. App'x 173 (10th Cir. 2009); *Botello v. Astrue*, 376 F. App'x 847 (10th Cir. 2010)). And, based on persuasive authority, the Court finds that the 50,000 remaining jobs represent a significant number in the national economy.

## V.   Conclusion and Recommendation

The Court recommends that the ALJ's decision be affirmed.

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision and Memorandum Brief (*Doc. 16*) be **denied**.

_____
UNITED STATES MAGISTRATE JUDGE

---

[8] The Court notes the irony of citing to *Pemberton* and *Ferguson*, both of which were decided by the Honorable Sam A. Crow, United States District Senior Judge, where in each the court found the opposite of what I am recommending – that is, of the remaining jobs that the ALJ considered, the court was not comfortable finding harmless error and remanded the case for the ALJ to determine whether the remaining number of jobs was "significant." *See Ferguson*, 2017 WL 2536436, at *4-*6 (declining to find 30,000 nationally available jobs significant); *Pemberton*, 2017 WL 1492934, at *5 (same, 12,000 jobs). The Court takes pains to point out, however, that while the court's analysis in both cases is reasoned and thoughtful, both relied heavily on *Trimiar*. As I noted in *King*, I believe the *Pemberton* and *Ferguson* "analysis conflates the situations in which the *Trimiar* analysis is not only required, but helpful." *King*, No. 16-cv-1147-KBM, Mem. Op. & Order, at 26 (D.N.M. Feb. 12, 2018).

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**